IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KRISTI LYN LUNBERY,

        Petitioner,                No. CIV S-07-1279 GGH P[1]

    vs.

TINA HORNBEAK, et al.,

        Respondents.       <u>ORDER</u>

_____/

I.  <u>Introduction and Summary</u>

        This action is proceeding on the petition transferred to this court from the United States District Court for the Northern District of California on June 28, 2007.

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus.  Petitioner challenges her 2004 conviction for second degree murder with personal use of a firearm (Cal. Penal Code §§ 817(a); 12022.5.)  Petitioner is serving a sentence of nineteen years to life.

        In a modern day version of Edgar Allan Poe's, *Tell Tale Heart*, petitioner confessed to the crime of murdering her husband long after she had been thought not to be a

_____

[1] This case proceeds before the undersigned pursuant to 28 U.S.C. § 636(c).

1

1    suspect.  The evidence at the time of the murder, including an "I'm -out-of-the-house" love note

2    written to petitioner's husband conspicuously posted in the residence, and petitioner's seeming

3    air tight out-of-the-house alibi had pointed away from petitioner.  Despite what some might term

4    attempts to create the perfect crime, she confessed years afterwards due to the vigorous

5    interrogation of police who were conducting a cold case investigation.  Petitioner raises the

6    following claims: (1) her trial counsel rendered ineffective assistance; (2) the trial court violated

7    her right to a fair trial by excluding evidence of third party culpability; (3) her rights to a fair trial

8    and to present a defense were violated by the failure of the trial court to impose appropriate

9    sanctions on the prosecution for failure to preserve information regarding the identity of a

10   confidential informant; (4) her right to due process was violated by the trial court's failure to

11   admonish the jury following prosecutorial misconduct; and (5) her right to due process was

12   violated by the admission into evidence of her involuntary confession.

13           After carefully considering the record, the court orders that the petition be denied.

14   II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

15           The AEDPA "worked substantial changes to the law of habeas corpus,"

16   establishing more deferential standards of review to be used by a federal habeas court in

17   assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

18   Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

19           In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

20   Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

21   for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

22   between "contrary to" clearly established law as enunciated by the Supreme Court, and an

23   "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

24   to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

25   Court on a point of law, or (2) if the state court case is materially indistinguishable from a

26   Supreme Court case, i.e., on point factually, yet the legal result is opposite.

1    "Unreasonable application" of established law, on the other hand, applies to

2    mixed questions of law and fact, that is, the application of law to fact where there are no factually

3    on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

4    Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

5    AEDPA standard of review which directs deference to be paid to state court decisions.  While the

6    deference is not blindly automatic, "the most important point is that an *unreasonable* application

7    of federal law is different from an incorrect application of law....[A] federal habeas court may not

8    issue the writ simply because that court concludes in its independent judgment that the relevant

9    state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

10   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

11   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

12   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

13   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

14        The state courts need not have cited to federal authority, or even have indicated

15   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

16   Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

17   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

18   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

19   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

20   established Supreme Court authority reviewed must be a pronouncement on constitutional

21   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

22   binding only on federal courts.  Early v. Packer, 123 S. Ct. at 366.

23        However, where the state courts have not addressed the constitutional issue in

24   dispute in any reasoned opinion, the federal court will independently review the record in

25   adjudication of that issue.  "Independent review of the record is not de novo review of the

26   constitutional issue, but rather, the only method by which we can determine whether a silent state

3

1   court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

2   2003).

3            In reviewing a state court's summary denial of a habeas petition, the court "looks

4   through" the summary disposition to the last reasoned decision. Shackleford v. Hubbard, 234

5   F.3d 1072, 1079 n. 2 (9th Cir. 2000)(citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S.Ct.

6   2590 (1991)).

7            In evaluating the claims raised in the instant petition, the California Court of

8   Appeal did not apply federal standards.  "The state court need not cite or even be aware of the

9   governing Supreme Court cases, 'so long as neither the reasoning nor the result of the state court

10  decision contradicts them.'" Powell v. Galaza, 328 F.3d 558, 563 (9th Cir. 2003), quoting Packer,

11  537 U.S. at 8, 123 S. Ct. at 365.  Accordingly, this court considers whether the opinion of the

12  California Court of Appeal in denying petitioner's claims was contrary to or an unreasonable

13  application of clearly established Supreme Court authority.

14  III. Background

15           The opinion of the California Court of Appeal contains a factual summary.  After

16  independently reviewing the record, the court finds this summary to be accurate and adopts it

17  below.

18           Defendant Kristi Lyn Lunbery's husband was shot and killed in
             1992.  The case remained unsolved until 2001 when it was
19           reopened and defendant confessed to killing him.  A jury convicted
             her of second degree murder (Pen.Code, § 187, subd. (a)) and
20           found she personally used a firearm in the commission of the
             offense. (Pen.Code, § 12022.5, subd. (a).)  The trial court
21           sentenced her to a total prison term of 19 years to life.

22                                              * * *

23           A.  The Prosecution's Case

24           In April 1992, defendant, her husband Charley Bateson (Bateson),
             the victim in this case, and their two young daughters lived in a
25           house on Fir Street in Burney.  The family had moved into the
             house the previous month.  Bateson owned a 30-30 Winchester
26           Model 94 rifle with a lever action that defendant's grandmother had

                                              4

given him as a gift.  He kept the rifle in its case in a closet at their prior residence on Ash Street.  However, his father saw it in Bateson's truck the week before Bateson's death.

Belinda Strickland had been a neighbor of the Bateson family at their prior residence on Ash Street and was defendant's friend.  At 11:47 a.m. on April 17th, Strickland received a collect telephone call from defendant, who said she was at the Mt. Shasta Mall in Redding, that she had a flat tire, Bateson was not answering the telephone, and she wanted Strickland to go over to defendant's house and wake up Bateson so he could help her.  Strickland drove over to the Bateson residence, knocked on the front door, and then yelled at the window.  Receiving no response, she entered the house through the unlocked front door.  She heard a radio coming from the bedroom.  The door to the bedroom was closed, so she opened it and found Bateson lying in the bed with the blankets pulled up to his neck.  He appeared to be dead.  Without entering the room or touching anything, she went to a nearby house and asked someone to call the police.  She then drove to Bateson's parents' house and told them he was dead.  Strickland continued to socialize with defendant but they never spoke about Bateson's death.

Detective Clemens contacted defendant at the Mt. Shasta Mall where she was waiting with her two children, her grandfather, Francis Conley, and her grandmother, Ethyl Miles.  She became visibly upset when told her husband was dead.  The group walked to defendant's car in the mall parking lot.  The left front tire was flat.  There was glass on the ground by the tire and a piece of glass was imbedded in the tread.

Defendant went to the sheriff's office where Detective Clemens and another officer interviewed her.  She told the officers that Bateson worked the swing shift at a lumber mill and that he finished working that morning at 3 a.m.  When he arrived home, he woke defendant up and they briefly chatted before he joined her in the hide-a-bed in the living room where they slept.

Defendant and the children awoke about three hours later around 6:30 a.m.  Bateson spoke to them for a short time and defendant told him she and the children were going shopping in Redding.  He asked her to set the alarm for 11:30 a.m. and told her he was going to change the lock on the front door.  He then moved to the children's bedroom to sleep.  Defendant set the alarm, put it in the bedroom, and closed the door.  She left a note for Bateson on the refrigerator just to remind him of what she had told him.  She did not lock the front door because she generally did not lock it when Bateson was home.

Defendant left the house with the two children about 8:00 a.m.  First, they went to her parents' house in Burney to drop off the dog.

5

Her grandfather, who was staying in the house while he visited the family, told defendant he was also going to Redding.  Defendant and the children then proceeded to the mall where she parked her car.  When she returned to the car after shopping, she discovered she had a flat tire and tried to call Bateson but he did not answer the telephone. Thinking she may have turned off the ringer on the telephone so he could sleep, she called Strickland and asked her to go wake up Bateson so he could help her with her tire.  When she saw her grandfather in the mall, he agreed to wait with her.

Defendant explained to the officers that the lock on the front door of her house needed to be changed because the night before, when she got home around 6:15 p.m., about an hour and a half after Bateson had left to go to work, she found the front door unlocked and all the lights turned on.  When she called Bateson at work, he told her he had left the door locked and the lights out. Defendant told the officers she thought her other grandmother, Margaret Beaman, had changed the lock when they moved into the house about two weeks before because the "people ... who used to live there" kept driving by the house.  Beaman had evicted those people because she believed, based on the large number of brief visitors to the house, that they "did drugs."  The boyfriend of the woman who lived there would drive by and "stare" at defendant and her family.

Defendant informed the officers that Bateson owned a rifle that he used for deer hunting.  She claimed not to have seen it since their recent move and did not believe Bateson kept it in his truck. Defendant claimed she and Bateson had no major problems and that things were "pretty smooth" between them.  When asked about financial problems, defendant said she and Bateson were a couple of payments behind in certain things.  Defendant believed Bateson's life insurance policy had lapsed.  She agreed to allow the officers to search her car, which when searched contained no weapons or evidence of blood stains.  The officers did not see any blood on defendant's clothing or person either.

Meanwhile, Shasta County Sheriff's Sergeant Wooden, who was in charge of the crime scene investigation, went to the house where he found Bateson in a back bedroom, lying on his back in a child-sized bed covered with cartoon motif sheets, wearing only his undershorts.  He had suffered one gunshot wound to the head, which was the cause of death.

The location and pattern of the fragments found from Bateson's skull, the bullet, and blood spatters on the floor, bedroom wall, door jam, and hallway just outside the bedroom door indicated that the bullet was fired from a high velocity rifle like a 30-30 and that the door to the bedroom was partly open when the gun was fired. Gunpowder marks on the pillow beneath Bateson's head indicated the muzzle of the gun was within four to six inches of his head when it was fired.  According to Sergeant Wooden, the shooter

6

may or may not have been splattered with blood and skull fragments.

A note on the refrigerator door in the kitchen read: "Hon, we ran down to Redding for a few more groceries and to look at a few things in the Target ad.  I'll bring something home for dinner.  Love, your three girls.  P.S. Be back around 1:00 or so."

There was no evidence of forced entry or ransacking of the house and no evidence that someone tried to clean up the blood in the home or tried to clean it from his or her person.  No firearm or expended shell casings were found in the house.[2]  Fingerprints and one palm print were lifted from the front and bedroom doors.  A number of them belonged to Bateson and defendant, and one belonged to Strickland.

The bullet and jacketing removed from Bateson's body and the bullet fragments recovered from the crime scene were .30 caliber.  The marks on the jacketing were consistent with the conclusion the bullet was fired from a Winchester Model 94 30-30 rifle, which fires .30 caliber bullets.  That model was the most common rifle that could have made the marks, although they could have been made by 27 different types of weapons.

In 2001, Shasta County Sheriff's Detective Grashoff was assigned to reevaluate Bateson's death.  On December 20, 2001, Detective Grashoff and Blankenship went to defendant's residence.  She had been previously notified that they wanted to speak with her and consented to the interview.  The detectives identified themselves, informed defendant of their cold case investigation and she invited them inside.  During the interview, defendant initially reiterated the version of events she had related to detectives in 1992, with a few changes.  She now recalled the lock on the front door had not been changed and the prior tenants may have had a key.  She indicated that while she probably did not lock the door when she left the house the morning of Bateson's death, she was not concerned about leaving him in the house with an unlocked door.  However, when she learned he had been shot, her first thought was to suspect her grandmother's former tenants because they were "into drugs" and had told her grandmother at the time she evicted them that "she would pay."  Defendant told the detectives that "the guy that used to live there ... resembled [Bateson]."

Defendant further stated that she had known her current husband, Troy Lunbery, since 1985.  During the period between 1985 and 1988, she and Bateson broke up for a period and she dated Lunbery before he went into the army.  She did not reconnect with him until

---

[2]  To eject an expended casing from a lever action rifle of the type owned by Bateson, the lever must be pulled to load another bullet into the firing chamber. (Footnote in opinion)

after Bateson's death in May 1992.  Defendant also told the detectives she received about $15,000 from a life insurance policy that Bateson had through his job.  About $4,000 or $5,000 of it went to pay funeral expenses.

Towards the end of the interview, after confronting defendant with a secret witness tip, an FBI profile on the case, and the inconsistencies in her story, the detectives told her they knew she did it, they just wanted to know why.  Urging her to tell the truth, the detective asked her if she shot Bateson, and she responded "yes."  She explained that he was asleep when she shot him and the bedroom door was already open.  She recalled that Bateson's rifle was in the closet and must have been loaded, because she did not remember loading it.  She remembered putting it in the car after she shot him and driving around a lot, but she did not remember what she did with the rifle.  She did not plan the shooting.  It was a spur of the moment thing.  She and Bateson had just argued about car insurance and a bounced check before he went to sleep.  However, she admitted that her call to Strickland may have been part of "a plan for her to find [Bateson]."

Upon further inquiry, defendant explained that she shot Bateson because she did not like the way he talked to her, that he was so controlling, that no one could say "hi" to her without it causing an argument or arousing "suspicion that [she] was sleeping with them...."  She was "very stressed" at the time of the shooting because they were living in a small house, she was trying to take care of a three-month-old and a three-year-old, finances were tough, they lived paycheck to paycheck, and Bateson was "controlling."  He would tell her "what [she] could and could not do...."  He "shut [her] off from everyone" and "grabbed" her by her arms "several times," leaving bruises.

Defendant told the detectives she "just wasn't thinking right" when she shot Bateson, explaining that "if you do something like that, you're not thinking straight.  I have grown a lot in the last nine years."  She would "never do something like that now.  And that, even doing something like that then, that's not me.  That is not in me.  So, I obviously was not thinking straight.  I mean, I couldn't have been."

Darci Hayes, who had been defendant's best friend since the first grade, testified that they often confided in each other and discussed their relationships with the men in their lives.  In 1991, the two friends saw a movie entitled "Mortal Thoughts."  After seeing the movie, they had a private running joke that Darci considered to be "wives venting" about things their husbands did that irritated them.  The joke began during telephone conversations after they were both married with children and before Bateson's death.  The joke was whether you would ever kill your significant other if you could get away with it.  It was similar to the plot of the movie.  During

one such conversation between defendant and Hayes, defendant complained about Bateson asking her where she was going whenever "she would get up to leave a room."

Hayes moved away from Burney in 1987.  However, when she returned for Bateson's funeral, the first thing defendant said to her when they were alone was "[d]on't ever tell anyone we talked about that movie."  This was the first and only time defendant made such a comment and was the last time she ever mentioned the movie. This comment was a reference to the movie "Mortal Thoughts."

B. The Defense

Defendant testified on her own behalf.  She denied killing Bateson, removing a gun from the house the morning of April 17, 1992, or having any knowledge of the killing.  She never had any exposure to firearms when she was growing up and never fired a gun.  She denied seeing Bateson's rifle after they moved to Fir Street.

Defendant's testimony concerning the events surrounding the shooting was consistent with her 1992 interview.  When her grandmother Miles appeared at the mall the morning of April 17th, and told defendant that Bateson had been shot, defendant fainted. She remained very upset and emotional in the aftermath of Bateson's death, spending most of her time in bed.

Defendant first met Bateson when she was in the eighth grade. When she graduated from high school, she attended Shasta College for about a half a semester.  She wanted to study early childhood education and hoped to work with kids at a preschool.  Defendant loved Bateson, they had a good relationship during the marriage, and he was a good father.  They had no significant problems.  He was not physically abusive or controlling.  They had plans to buy their own house and raise their children.  Defendant's grandmother allowed them to move into her house on Fir Street rent free so they could save money for a down payment on a house.

Defendant testified that when the detectives interviewed her in 2001 she felt stressed but tried her best to help them out and to remember what she could.  During the first part of the interview, the officers were "laid back and friendly," gathering details for their investigation.  However, at some point, the detective told her they suspected her.  While she told them she did not do it, they continued to accuse her.  She became scared, nervous and overwhelmed.  When the detective implored her to tell the truth for the sake of her children, his body language changed and he became more intense.  She became scared because she did not know what he could do.  She falsely confessed to shooting Bateson because she believed that is what the detectives wanted to hear, and as soon as she admitted shooting him, the detective's demeanor and tone changed.  She thought she needed to give the detectives some

1   information to get them to leave her house, so she falsely told them
2   Bateson was controlling and abusive because they had already
    suggested that as a possible motive.

3   Defendant denied ever seeing the movie "Mortal Thoughts,"
    having a running joke with Darci Hayes about that movie, or
4   telling her that Bateson was overly possessive or concerned about
    her whereabouts.  Defendant also denied telling Hayes at the time
5   of the funeral not to mention the movie.

6   Many of defendant's family and friends testified to her passive,
    calm, gentle, sweet, caring and patient character, which in their
7   opinion was completely inconsistent with someone who would
    shoot her husband.

8

9   (Pet., Ex. A (Opinion) at 2-11.)

10  IV.  Petitioner's Claims

11       A.  Ineffective Assistance of Counsel

12       Petitioner's first claim is that her trial counsel rendered ineffective assistance by

13  failing to present expert testimony explaining why a person would confess to a crime she did not

14  commit.  (Pet. at 11.)  Petitioner states that her trial counsel had retained an expert to explain to

15  the jury that "innocent people do in fact confess to crimes they do not commit," but that he failed

16  to call this expert as a witness.  (Id.)  She claims that this failure "constituted ineffective

17  assistance of counsel and denied petitioner the only defense she had."  (Id.)

18       This claim was raised for the first time in a petition for writ of habeas corpus filed

19  in the California Supreme Court.  (Respondents' Lodged Doc. No. 7.)  The Supreme Court

20  summarily denied the petition by order dated June 18, 2007.  (Respondents' Lodged Doc. No. 8.)

21  Under these circumstances, this court will independently review the record to determine whether

22  the state court decision is objectively unreasonable.  Himes, 336 F.3d at 853.

23       1.  Legal Standards

24       The Sixth Amendment guarantees the effective assistance of counsel.  The United

25  States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

26  Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  Id. at  687-88.  After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally, competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  In assessing an ineffective assistance of counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, a petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at 691.  "This includes a duty to . . . investigate and introduce into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that question to undermine confidence in the verdict."  Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (citing Hart v.

1   Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999)).   In this regard, it has been recognized that "the

2   adversarial process will not function normally unless the defense team has done a proper

3   investigation."   Siripongs v. Calderon (Siripongs II), 133 F.3d 732, 734 (9th Cir. 1998) (citing

4   Kimmelman, 477 U.S. at 384).   Therefore, counsel must, "at a minimum, conduct a reasonable

5   investigation enabling him to make informed decisions about how best to represent his client."

6   Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th Cir. 1995) (quoting Sanders v. Ratelle, 21 F.3d

7   1446, 1456 (9th Cir. 1994) (internal citation and quotations omitted)).   On the other hand, where

8   an attorney has consciously decided not to conduct further investigation because of reasonable

9   tactical evaluations, his or her performance is not constitutionally deficient.   See Siripongs II,

10  133 F.3d at 734; Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998); Hensley v. Crist, 67

11  F.3d 181, 185 (9th Cir. 1995).   "A decision not to investigate thus 'must be directly assessed for

12  reasonableness in all the circumstances.'"   Wiggins, 539 U.S. at 533 (quoting Strickland, 466

13  U.S. at 691).   See also Kimmelman, 477 U.S. at 385 (counsel "neither investigated, nor made a

14  reasonable decision not to investigate"); Babbitt, 151 F.3d at 1173-74.   A reviewing court must

15  "examine the reasonableness of counsel's conduct 'as of the time of counsel's conduct.'"   United

16  States v. Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990) (quoting Strickland, 466 U.S. at 690).

17  Furthermore, "'ineffective assistance claims based on a duty to investigate must be considered in

18  light of the strength of the government's case.'"   Bragg, 242 F.3d at 1088 (quoting Eggleston v.

19  United States, 798 F.2d 374, 376 (9th Cir. 1986)).

20              2.   Merits of Petitioner's Claim

21              Petitioner had two trial counsel: Jeffrey Jens and Jeffrey Gorder.   Prior to trial,

22  Mr. Jens retained Dr. Richard Ofshe, an expert in the field of coercive police interrogation

23  techniques and the phenomenon of false or coerced confessions.   (Pet., Ex. C.)   After meeting

24  with petitioner, Dr. Ofshe concluded that petitioner's confession was not "the product of the use

25  of psychologically coercive interrogation tactics."   (Pet., Ex. B.)   However, notwithstanding this

26  conclusion, he opined that petitioner may have confessed falsely as a reaction to the stress of the

occasion.  (Id.)  Dr. Ofshe made the following observations:

> Ms. Lunbery maintains that she is not responsible for her former husband's death and essentially explains her decision to confess as a reaction to the stress of the interrogation in combination with the pressures of the day on which the Detective visited her.  Ms. Lunbery is describing a well recognized type of confession – a stress compliant false confession.
>
> This type of false confession comes about when persons who are exceptionally vulnerable to interpersonal pressure and are unable to cope with the intensity of even a non-coercive interrogation are put in a position from which it appears to them that the only way to end the intolerable pressure they are experiencing is to comply with the interrogator's demand for a confession.
>
> * * *
>
> I should mention that given what I know of the case facts, it does not appear that Ms. Lunbery revealed any verifiable information about the crime that suggested that she had actual knowledge of how her former husband was killed, nor does her confession present a particularly plausible account of the crime.  The failure of a confession to fit the facts of a crime and the inability of a confessor to supply information that should be known to the perpetrator is a hallmark of a false confession.

(Id.)

Dr. Ofshe advised Mr. Jens to have petitioner evaluated by a psychologist who was familiar with the phenomenon of false confessions in order to determine whether she had the personality attributes that might result in a false confession.  (Id.)  He told Mr. Jens that a local psychologist could obtain the relevant test on the "web."  (Id.)  In response to this advice, Jens consulted with several local psychologists.  (Pet., Ex. C.)[3]  One of them told Jens that "even if the [test suggested by Dr. Ofshe] were valid and Kristi scored among those considered at risk to be easily manipulated he would need additional corroboration to support any conclusion that Kristi was vulnerable to manipulation techniques."  (Id.)  This psychologist also "pointed out

---

[3]  Petitioner contends that "instead of retaining the services of a psychologist who was familiar with the psychological tests relating to the giving of false confessions, defense counsel retained local psychologists who were unfamiliar with this area of psychology."  (Pet. at 15.)

that such a person should have a history of incidences which factually were based on manipulation."  (Id.)  With this advice in mind, Mr. Jens interviewed petitioner "and her mother several times and specifically asked about psychological, familial, and peer history to which they have reported there was no prior incidences of manipulation vulnerability."  (Id.)  Jens ultimately decided not to call Dr. Osfhe as a witness at petitioner's trial.  He explained the reasoning behind this decision as follows:

> My evaluation is that for several reasons such testimony would not be admissible in the face of a Kelly-Frye objection.  Firstly, the "Gudjohnsson test" is not widely accepted in the medical community.  Dr. Ofshe stated that he believed Kristi when she said she didn't kill her husband; but it would be the first case of its nature testified to in a US courtroom based on "Gudjohnsson test".  The reliability of any data used to form opinions regarding test results would be no corroboration historically in Kristi's case. . .
>
> I have discussed all of these details and evidentiary issues with my co-counsel Jeff Gorder and we both have concluded that at this juncture there is a dramatically insufficient basis for Dr. Ofshe's testimony.  We have also considered the negative impact an expert can have when his testimony is so lacking in substance.  As Dr. Caruso put it:  "Kristi's best defense would be her explanation, the jury needs to believe Kristi."

(Id.)

Petitioner's habeas counsel declares that she spoke to Mr. Jens as part of her investigation of petitioner's claim of ineffective assistance of counsel.  (Pet., Ex. D.)  Jens stated that the decision not to call Dr. Ofshe as a witness was made by Jeffrey Gorder, who actually represented petitioner at trial.  (Id.)  Habeas counsel subsequently contacted Mr. Gorder, who stated that "he was not involved in making the decision to not call Dr. Ofshe as a witness" and that "by the time he was assigned to the case, the decision not to call Dr. Ofshe was made by Mr. Jens."  (Id.)

Dr. Ofshe subsequently wrote a letter to petitioner.  He described the testimony he would have given at her trial as follows:

> I could have helped the jury understand that what you were

1
2
3
4

> describing is something that is well recognized by those who study
> interrogation and false confession.  I could have helped them
> understand that since false confessions happen and happen for the
> reasons you gave, they needed to get past the fact that you said "I
> did it" and look at the evidence and your lack of knowledge of how
> the crime happened.  This is how they needed to weigh your
> confession and to decide whether it was a true or false statement.

5   (Pet., Ex. E.)  In a declaration provided to habeas counsel, Dr. Ofshe further described what his

6   testimony might have been had he been called to testify at petitioner's trial.  (Pet., Ex. F.)  In that

7   declaration, he states that petitioner "still must be evaluated by a competent psychologist who is

8   familiar with the use of the Gudjonsson test as a diagnostic instrument for the phenomenon of

9   interrogative suggestibility."  (Id.)  He states that "had [petitioner] been administered the

10  Gudjonsson test and scored high, I would have testified about false confessions and how to

11  evaluate them."  (Id.)

12          Prior to the filing of the instant habeas petition, petitioner was evaluated by a

13  psychologist who is familiar with the use of the Gudjonsson test.  (Pet. at 18.)  Taking all of the

14  various test data into consideration, this psychologist concluded that petitioner "has the

15  personality features that made her vulnerable to giving a false confession." (Pet., Ex. G at 7.)

16  However, he noted that petitioner "scored only average in suggestibility" which measures

17  "people who are susceptible to giving erroneous accounts of events when subject to questioning."

18  (Id. at 6.)

19          Petitioner testified at her trial.  She attempted to explain why her confession was

20  false.  She also stated that she did not commit the crime.  (Lodged Doc. No. 9 at 884-95.)

21  Petitioner's friends and family testified that she was not the type of person who could have

22  committed murder.  However, petitioner claims that her trial counsel should also have introduced

23  the testimony of Dr. Ofshee in support of her defense that she falsely confessed to the murder of

24  her husband.  She argues that counsel's failure to do so deprived the jury "of critical information

25  it should have had in evaluating petitioner's case."  (Pet. at 21.)  She explains:

26          Had counsel followed through on Dr. Ofshe's recommendation that

1   further testing be administered on petitioner, to assist in
    determining the reliability of her "confession," and called upon Dr.
2   Ofshe to testify at petitioner's trial, counsel could have effectively
    attacked the commonly held belief that people do not confess to
3   murders they did not commit.  Trial counsel's representation fell
    below an objective standard of reasonableness in failing to
4   challenge the confession as false.

5   (Id. at 22.)

6           3. Need for Evidentiary Hearing

7           Petitioner did not make a motion for evidentiary hearing.  However, in the

8   petition, she made a *pro forma* request for one, and in the traverse, she made an actual request.

9   Respondent did not reference the need for an evidentiary hearing, but respondent did not object

10  to the post-trial information presented to the California Supreme Court which has been set forth

11  above.

12          Petitioner does not indicate what else she would like to present at evidentiary

13  hearing, and the court does not know of what else could be presented either.  Therefore, the

14  undersigned accepts the post-trial filings herein, and will consider them along with the trial

15  record as a whole.  To the extent that it is necessary to expand the federal record with the post-

16  trial filings, it is so ordered.  For the reasons set forth below, no evidentiary hearing is necessary.

17          The ordinary standards under federal law for an evidentiary hearing, which are

18  well known and well established in the Ninth Circuit, are as follows.   "To obtain an evidentiary

19  hearing on an ineffective assistance of counsel claim, a habeas petitioner must establish that (1)

20  his allegations, if proven, would constitute a colorable claim, thereby entitling him to relief and

21  (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant

22  facts." Correll v Stewart, 137 F.3d 1404, 1413 (9th Cir. 1998).  Nevertheless, the court does not

23  have to hold an evidentiary hearing when the record clearly refutes the collateral factual

24  allegations raised by petitioner.  Schiro v. Landrigan, __U.S.__, 127 S. Ct. 1933, 1940 (2007).

25  Moreover, Schriro also announced that in determining whether to grant an evidentiary hearing

26  the federal court must apply the AEDPA deferential standards to legal and factual questions

16

necessarily reached by the state courts.  Id.  Thus, for example, if the reasons for counsel actions were at issue, but under deferential standards, the court could not find prejudice, no evidentiary hearing would be necessary.

One other important caveat exists to the "mandatory" nature of evidentiary hearings, and it is well set forth by Williams v. Woodford, 384 F.3d 567, 590-591 (9th Cir. 2004):

> We have previously held that a district court in a habeas corpus proceeding "need not conduct full evidentiary hearings," but may instead "expand the record ... with discovery and documentary evidence." Watts v. United States, 841 F.2d 275, 277 (9th Cir.1988) (per curiam) (denying a habeas corpus petitioner's contention that the district court erred in resolving a claim based on contradictory affidavits and interrogatories without an evidentiary hearing at which oral testimony could be provided).
>
> ***
>
> Other circuits have similarly held that "there is a permissible intermediate step that may avoid the necessity of an expensive and time consuming hearing in every [habeas corpus] case. It may instead be *591 perfectly appropriate, depending upon the nature of the allegations, for the district court to proceed by requiring that the record be expanded to include letters, documentary evidence, and, in an appropriate case, even affidavits." Chang v. United States, 250 F.3d 79, 86 (2nd Cir.2001) (finding no abuse of discretion when the district court dismissed the petitioner's claim without an evidentiary hearing with live witnesses) (citing Raines v. United States, 423 F.2d 526, 529-30 (4th Cir.1970)); see also Blackledge, 431 U.S. at 81-82, 97 S.Ct. 1621 ("[A]s is now expressly provided in the Rules Governing Habeas Corpus Cases, the district judge ... may employ a variety of measures in an effort to avoid the need for an evidentiary hearing.... In short, it may turn out ... that a full evidentiary hearing is not required."); Spreitzer v. Peters, 114 F.3d 1435, 1456 (7th Cir.1997) (same).
>
> ***
>
> However, in construing Blackledge, our circuit and the Second Circuit have found no abuse of discretion when the district court "conclude[d] that [a full evidentiary] hearing would not offer any reasonable chance of altering its view of the facts." Chang, 250 F.3d at 86; Watts, 841 F.2d at 277 (finding that, in the case at hand, the issue of credibility could be conclusively decided on the basis of documentary testimony and evidence in the record).

The undersigned finds that petitioner will receive a fair consideration of her claim by considering the extra-record materials lodged by petitioner, and expanded into this record, supporting her claim.

\\\\\

\\\\\

17

1          4. <u>Discussion of Merits</u>

2          In support of her claim in this regard, petitioner cites <u>United States v. Hall</u>, 93

3   F.3d 1337 (9th Cir. 1996.)  In that case, which involved an appeal of a federal criminal

4   conviction, the appellant claimed that the district court applied an incorrect standard in excluding

5   proffered expert testimony (from Dr. Ofshe) regarding appellant's susceptibility to giving a false

6   confession.  The appellate court concluded that the proffered testimony was admissible under the

7   federal rules of evidence.  In relevant part, the court made the following observations:

8          Dr. Ofshe's testimony, assuming its scientific validity, would have
           let the jury know that a phenomenon known as false confessions
9          exists, how to recognize it, and how to decide whether it fit the
           facts of the case being tried.  The district court's conclusion
10         therefore missed the point of the proffer.  It was precisely because
           juries are unlikely to know that social scientists and psychologists
11         have identified a personality disorder that will cause individuals to
           make false confessions that the testimony would have assisted the
12         jury in making its decision.  It would have been up to the jury, of
           course, to decide how much weight to attach to Dr. Ofshe's theory,
13         and to decide whether they believed his explanation of Hall's
           behavior or the more commonplace explanation that the confession
14         was true.  See 18 U.S.C. § 3501.  But the jury here may have been
           deprived of critical information it should have had in evaluating
15         Hall's case.

16         In these circumstances, we cannot conclude that the court's failure
           to conduct a full Daubert inquiry, applying the correct legal
17         standards under [Federal Rule of Evidence] Rule 702, was
           harmless error.
18

19   <u>Id.</u> at 1345.  Although these observations have some applicability to the instant case, the claim

20   raised by petitioner does not concern the admissibility of evidence.  Rather, the issue here is

21   whether trial counsel's decision not to present expert testimony regarding false confessions

22   constituted ineffective assistance of counsel.

23          As described above, Mr. Jens investigated the possibility of calling Dr. Ofshe as a

24   witness.  He interviewed Dr. Ofshe and followed up on his advice by contacting several local

25   psychologists.  Ultimately, after talking with these psychologists and interviewing petitioner and

26   her mother, either he or Mr. Gorder (or both) decided for tactical reasons not to present this

1    evidence.  Mr. Jens believed the evidence was too speculative to be of help to the jury and would

2    not be admissible in any event.  (Pet., Ex. C.)  He also considered the possible costs of Ofshee's

3    testimony and the failure of petitioner and her family to provide evidence of prior vulnerability to

4    manipulation.  (Id.)  Defense counsel believed that the best defense strategy was to rely on

5    petitioner's testimony alone to convince the jury that she was innocent and that her confession

6    was false.  Counsel's decision not to present the testimony of Dr. Ofshe, based on these

7    considerations, was not unreasonable.[4]

8            A trial counsel's reasonable tactical decisions are "virtually unchallengeable."

9    Strickland, 466 U.S. at 690.  As the United States Supreme Court has explained,

10               strategic choices made after thorough investigation of law and facts
                 relevant to plausible options are virtually unchallengeable; and
11               strategic choices made after less than complete investigation are
                 reasonable precisely to the extent that reasonable professional
12               judgments support the limitations on investigation.  In other words,
                 counsel has a duty to make reasonable investigations or to make a
13               reasonable decision that makes particular investigations
                 unnecessary.  In any ineffectiveness case, a particular decision not
14               to investigate must be directly assessed for reasonableness in all
                 the circumstances, applying a heavy measure of deference to
15               counsel's judgments.

16   Id. at 690-91.  In addition, "[f]ew decisions a lawyer makes draw so heavily on professional

17   judgment as whether or not to proffer a witness at trial[.]"  Alcala v. Woodford, 334 F.3d 862,

18   871 (9th Cir. 2003) (quoting Lord v. Wood, 184 F.3d 1083, 1095 (9th Cir. 1999)).  See also

19   Siripongs II, 133 F.3d at 735 (finding counsel's performance to be based on a reasonable tactical

20   decision when, after hiring an expert and investigating a possible defense, counsel decided it was

21   not credible enough to present to the jury).

22            Although petitioner's trial counsel did not have petitioner evaluated to determine

23   whether she was susceptible to confessing to a crime she did not commit, this court does not find

24   that fact dispositive.  Counsel's own investigation revealed that neither petitioner nor her mother

25   _____

26   [4] Dr. Ofshe now states that he would have testified without remuneration, if asked.  Pet.,
     Ex. E.  However, defense counsel was not aware of this at the time of petitioner's trial.  (Id.)

19

could report "prior incidences of manipulation vulnerability." (Pet., Ex. C.) Given this fact, it was not unreasonable for counsel to decline further testing. Moreover, counsel could have been reluctant to expose Dr. Ofshe to cross-examination given the lack of previous examples of petitioner showing such vulnerability and the fact that they could reasonably expect that the state would provide rebuttal experts to confirm foundational problems in Ofshe's testimony. Cf. Williams v. Woodford, 384 F.3d 567, 611 (9th Cir. 2004) ("Moreover, it is 'acceptable trial strategy to choose not to call psychiatrists to testify when they an be subjected to cross-examination based on equally persuasive psychiatric opinions that reach a different conclusion.'"). Applying a "heavy measure of deference" to trial counsel's tactical decision not to call Dr. Ofshe, this court concludes that petitioner has failed to demonstrate counsel's investigation or his performance were outside the range of reasonable professional assistance.

The undersigned understands that the testimony of the defendant herself regarding her vulnerability to manipulation in stressful situations could readily be viewed as self-serving, and in need of corroboration. However, it was up to the attorney to determine whether the corroboration to be given by the expert was more problematic than salutary. The fact that one can argue in hindsight, especially after the verdict and in light of petitioner's present day evidence, that petitioner might have been better off with the expert testifying after all, does not constitute grounds to find counsel unreasonable.

Because the undersigned has found that counsel did not act unreasonably, there is no need for the court to determine prejudice or lack thereof by an exhaustive analysis of the extra-record evidence.

For the foregoing reasons, the decision of the California Supreme Court rejecting petitioner's claim of ineffective assistance of counsel is not contrary to or an unreasonable application of Strickland. Accordingly, petitioner is not entitled to relief on this claim.

/////

/////

B. Evidence of Third Party Culpability

Petitioner claims the trial court violated her constitutional right to present a defense when it excluded her proffered evidence of third party culpability. (Pet. at 23.) The California Court of Appeal fairly described the background to this claim as follows:

In response to the People's motion to exclude evidence of third party culpability, defendant proffered the following items of evidence:

(1) Margaret Beaman, defendant's grandmother, was the owner of the Fir Street residence where the killing occurred. A short time before defendant and Bateson moved into that residence, it was occupied by Cynthia Ellis and her ex-husband Frank Delgado, a known drug dealer. After Ellis and Delgado moved in, Ms. Beaman noticed an increase in traffic to and from the house at all hours of the day and night in a relatively rural area, consistent with drug sales, and she evicted them because of that activity.

(2) A confidential informant (CI) told Shasta County Sheriff's Detective Willie Cox on April 20, 1992, that the killing of Bateson was a mistake and that the intended victim was Frank Delgado because Delgado had "ripped off several people in town over drug dealings."

(3) Finger and palm prints were lifted from the murder scene that did not match any of the exemplars from people who would have been in the residence in the recent past.

(4) On April 16, 1992, defendant returned home to find the front door unlocked even though Bateson was at work. Because this was a very unusual situation, she called him at work because she was concerned about this.

(5) At approximately 3:30 a.m. on April 16th, a neighbor who lived across the street from the Bateson residence saw a dilapidated Ford Fiesta drive down Fir Street, make a u-turn at the dead-end, park in front of the Bateson residence for 20 to 30 seconds, and then drive away at a fast rate of speed. A CI told Detective Cox that Delgado and at least one of Delgado's acquaintances from the drug-world were associated with that vehicle.

(6) Two weapons not connected to defendant could not be ruled out as the murder weapon.

(7) When Ms. Beaman evicted Delgado, he told her "she would be sorry."

/////

21

1    (8) Oney Rhoades, an acquaintance of Delgado's, had stayed at the
     Fir Street house with Delgado in late February and saw Delgado
2    and Henry Garza in possession of a flask of dope worth $40,000.

3    (9) A Sheriff's sergeant told a detective that Bateson bore a strong
     resemblance to an individual who had recently been employed as
4    an undercover agent who had attempted to buy drugs from Delgado
     and others.
5
     (10) Rory Keim told the police that he and some friends were in a
6    restaurant discussing Bateson's death when Henry Garza, who was
     sitting nearby, approached them and said "[t]hat's a bummer, my
7    partners blew away the wrong dude."  At the time of the offer of
     proof, Garza was deceased.
8
     The court granted the People's motion to exclude this evidence.
9    The court based its ruling on its conclusions that inadmissible
     hearsay cannot form the basis for third-party culpability evidence,
10   there was an insufficient showing under Hall, supra, 41 Cal.3d 826,
     and the evidence was inadmissible under Evidence Code section
11   352 because it had slight probative value, was prejudicial to the
     prosecution, would be very time consuming, was likely to mislead
12   and confuse the jury, and was insufficient to raise a reasonable
     doubt of defendant's guilt.  The court advised counsel however,
13   that he could inquire into exculpatory fingerprint or firearm
     evidence in order to give evidentiary weight to defendant's claim
14   she did not commit the murder.

15   (Opinion at 12-14.)

16          The California Court of Appeal rejected petitioner's claim that the trial court

17   violated her constitutional right to present a defense when it excluded the above-described

18   evidence.  The court found that "the evidence showed nothing more than that a third party had a

19   motive and opportunity to commit the offense and therefore the evidence failed to meet the

20   threshold under People v. Hall (1986) 41 Cal.3d 826 ( Hall )."  (Id. at 12.)  The appellate court

21   explained its reasoning as follows:

22          We review the trial court's ruling for abuse of discretion, which we
            may find only if the ruling exceeded the bounds of reason,
23          considering all the circumstances.  (citations omitted.)

24          The admissibility of third-party culpability evidence is governed by
            the same rules governing the admissibility of other evidence.  It is
25          admissible if it is relevant to raise a reasonable doubt of the
            defendant's guilt (Evid.Code, § 350) and its probative value is not
26          substantially outweighed by the risk of undue delay, prejudice, or

                                        22

confusion. (Evid.Code, § 352; Hall, supra, 41 Cal.3d at p. 834; People v. Bradford (1997) 15 Cal.4th 1229, 1325.)  In determining the probative value, the Supreme Court has held that "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (Hall, supra, 41 Cal.3d at p. 833.)

The only real evidence directly or circumstantially linking someone other than defendant to the murder is Rory Keim's statement that Henry Garza said his partner killed the wrong man.  However, as the trial court correctly noted, inadmissible hearsay statements cannot form the basis for a third party culpability defense.  (People v. Bradford, supra, 15 Cal.4th at pp. 1324-1325.)   Defendant claims this evidence is admissible as a statement against penal interests because Garza knew it was his crime partner who committed the homicide and that the offense was a case of mistaken identity.  Respondent contends the trial court correctly concluded this statement was not against Keim's penal interest because he did not admit, and implicitly denied, playing any personal role in the murder.  We agree with respondent that Keim's statement was properly excluded.

Because Keim's statement was offered for its truth, it is hearsay. (Evid.Code § 1200, subd. (a); People v. Duarte (2000) 24 Cal.4th 603, 610.)  A hearsay statement made against the declarant's penal interest is admissible under Evidence Code section 1230, which provides in pertinent part: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, ... so far subjected him to the risk of ... criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true."

When proffering such evidence, "the proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character."  (People v. Duarte, supra, 24 Cal.4th at pp. 610-611.)

The offer of proof indicates that Keim spoke to Detective Compomizzo on May 6, 1992, and told him that he and some friends were recently at a pizza parlor discussing Bateson and his death.  Garza, who was sitting a few tables away, approached them and said "[t]hat's a bummer, my partners blew away the wrong dude."

The requirement of unavailability was met because Garza was

deceased at the time the evidence was proffered.  However, Garza's statement did not satisfy the second and third requirements of the hearsay exception.  It was not against his penal interest because it did not implicate him in the commission of the murder and his use of the words "my partners" did not establish he used that term to mean his partners in committing the Bateson murder or any other offense.  Additionally, the statement lacks sufficient indicia of reliability.  Garza made the statement to Keim and Keim's friends in a pizza parlor after eavesdropping on their conversation. According to the detective's report, Keim stated that Garza was "drinking and arguing" with some other people when he made this statement.[5]  The statement may have been nothing more than boasting or the mindless remark of someone under the influence of alcohol.  Additionally, the report states that Garza "did not indicate any names or how the shooting took place."  Thus, there is no indication he had personal knowledge of the murder.  Indeed, his statement may have been based on multiple levels of hearsay.  The statement was therefore inadmissible.

The remaining items of proffered evidence are also inadmissible. At best, some of the evidence showed that Frank Delgado or others may have had a motive and/or the opportunity to murder Bateson, either in revenge for being evicted or as the unintended victim in a case of mistaken identity (items 1, 2, 4, 5, 7.)  As such, the evidence was inadmissible because it lacked sufficient probative value to raise a reasonable doubt of defendant's guilt under Hall, supra, 41 Cal.3d at page 833.  Likewise, the fingerprint and weapons evidence had little probative value (items 3, 6),[6] the CI's statement was inadmissible hearsay (item 5) ( Evid.Code. § 1200, subd. (a)), and the evidence that Delgado was involved with drugs was inadmissible character evidence.  (item 8) (Evid.Code, § 1101; People v. Adams, supra, 115 Cal.App.4th at p. 253.)[7]

---

[5] [footnote in text of opinion] This report was submitted to the trial court in connection with another matter at approximately the same time the motion to exclude the third-party culpability evidence was made and therefore was before the court when it ruled on the People's motion to exclude the third-party culpability evidence.

[6] [footnote in text of opinion] The fingerprint and palm print evidence only established that other people had been in the house.  Since defendant and her family had only lived in that house for approximately two weeks, the presence of other prints is not surprising.  Similarly, the fact two other weapons could not be ruled out as the murder weapon, does not constitute direct or circumstantial evidence linking someone else to the offense.

[7] [footnote in text of opinion] Much of this evidence was nevertheless introduced into evidence by way of defendant's tape-recorded interviews and expert testimony.  Defendant told detectives that her grandmother, Ms. Beaman, evicted Ellis and Delgado because of apparent drug dealing and that one of them told her she would "pay" for evicting them (items 1 and 7), that those people continued to drive by the house and stare at defendant and her family (item 6),

1
2
3
4
5
6
7

> Defendant did not proffer any admissible direct or circumstantial evidence linking anyone other than defendant to the actual murder, such as blood stained clothing, identifiable fingerprints, palm prints, or shoe prints, or eye witness testimony that someone other than defendant was seen entering or exiting the Bateson residence during the early morning of April 17, 1992.  (See People v. Alcala (1992) 4 Cal.4th 742, 793.)  The fact someone saw a Ford Fiesta at 3:30 a.m. the morning before the murder was not probative.  It remained there for only 20 to 30 seconds and no one was seen exiting or entering the car at that time.  Accordingly, because the proffered evidence was insufficient to raise a reasonable doubt about defendant's guilt, the trial court did not abuse its discretion in excluding it.

8    (Opinion at 14-19.)

9            Due process includes a criminal defendant's right to "a meaningful opportunity to

10   present a complete defense."  Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citation and internal

11   quotations omitted).  Evidence rules violate this right if they "infring[e] upon a weighty interest

12   of the accused and are arbitrary or disproportionate to the purposes they are designed to serve."

13   Holmes v. South Carolina, 547 U.S. 319, 324 (2006)  (citation and internal quotations omitted).

14   Nevertheless, trial judges have "'wide latitude' to exclude evidence that is 'repetitive ..., only

15   marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the

16   issues.'"  Crane, 476 U.S. at 689-90, (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679

17   (1986)).

18           Evidence of potential third-party culpability must be admitted when, under the

19   "facts and circumstances" of the individual case, its exclusion would deprive the defendant of a

20   fair trial.  Chambers v. Mississippi, 410 U.S. 284, 303 (1973).  The Court of Appeals for the

21   Ninth Circuit has determined that where the proffered evidence simply affords a possible ground

22

23   that the day before the killing defendant returned to the house and found the door unlocked and
     the lights on suggesting that someone might have gained access to the house that day (item 4),
24   and that the man who used to live in the house looked like Bateson (item 9).  Expert testimony
     showed there were unidentified fingerprints in the house and an unidentified palm print on the
25   bedroom door molding while the firearm expert acknowledged that several types of firearms
     other than Bateson's missing rifle could have been the murder weapon (items 3 and 6).
26   Additionally, the defense introduced evidence that the crime scene investigator found
     unidentified footprints in a wooded area near the house.

1   of suspicion pointing to a third party and does not directly connect that person with the actual

2   commission of the offense, that evidence may be excluded.  See People of Territory of Guam v.

3   Ignacio, 10 F.3d 608, 615 (9th Cir. 1993) (citing Perry v. Rushen, 713 F.2d 1447, 1449 (9th Cir.

4   1983)).  Under California law, a criminal defendant has a right to present evidence of third party

5   culpability if it is capable of raising a reasonable doubt regarding his own guilt.  See Spivey v.

6   Rocha, 194 F.3d 971, 978 (9th Cir. 1999) (citing People v. Hall, 41 Cal. 3d 826, 833 (1986)).  In

7   order for evidence pointing to another suspect to be admissible, however, "there must be direct or

8   circumstantial evidence linking the third person to the actual perpetration of the crime."  Hall, 41

9   Cal. 3d at 833.  Motive or opportunity is not enough.  Id.[8]

10          As discussed above, the California Court of Appeal found the proffered evidence

11  of third-party culpability inadmissible because it was unreliable, lacked sufficient probative value

12  to raise a reasonable doubt of petitioner's guilt, and was based, in part, on inadmissible hearsay

13  and character evidence.  (Opinion at 18.)  These conclusions are not unreasonable.  At most, the

14  evidence affords a possible ground of suspicion pointing to several third parties and does not

15  directly connect any person with the actual commission of the offense.  Speculative rumors about

16  the reason for Bateson's murder, the identity of other potential suspects, or the possibility that the

17  killing was accidental, would not have been sufficient to change the outcome of petitioner's trial.

18  Further, as noted by the state appellate court, much of the evidence excluded by the trial court

19  was introduced into evidence by other means.  (Id. at 18 n.4.)

20          Neither the California rule of evidence requiring sufficient evidence linking the

21  third person to the crime, nor its application by the trial court in this case, constitutes a due

22  process violation.  Therefore, the appellate court's decision did not involve an unreasonable

23  application of clearly established federal law.  See Holmes, 547 U.S. at 319, 327 (acknowledging

24  the right of a state court to exclude defense evidence that is too "remote [or] lack[s] such

25

26          [8] In Holmes, the Supreme Court noted that rules such as that set forth in Hall are "widely
     accepted."  547 U.S. at 327 n.*.

1   connection with the crime" to raise a reasonable doubt as to the accused's guilt).  Accordingly,

2   petitioner is not entitled to relief on this claim.

3       C.  Trial Court's Failure to Impose Sanctions on Prosecution

4           Petitioner's next claim is that her rights to a fair trial and to present a defense were

5   violated by the failure of the trial court to impose appropriate sanctions on the prosecution for

6   failure to preserve information regarding the identity of a confidential informant.  The California

7   Court of Appeal fairly described the background to this claim as follows:

8           An investigative report summarized the statement made by a CI to
            Detective Cox in 1992.  The report states that the CI told Cox he
9           knew Bateson, that the CI "felt the murder was a mistake" and the
            "CI thought Frank Delgado was supposed to have been killed."
10          The CI explained that it was about drugs and that Delgado had
            "ripped off several people in town over drug dealings."  The CI
11          noted that Delgado had usually slept until the afternoon in the same
            bedroom where Bateson was killed, and along with Henry Garza,
12          was associated with a white Ford Fiesta with reddish orange
            stripes.  The CI identified three people who could "possibly" have
13          murdered Bateson believing he was Delgado: (1) the brother of
            Cindy Ellis, whose name the CI did not know, but who did not get
14          along very well with Delgado, (2) Ellis's current boyfriend, Les,
            who had a feud with Delgado over Ellis and drugs, or (3) someone
15          associated with Henry Garza, who Delgado suspected of working
            for the police, such as Rhodes or the Lagoo families.
16
            Defendant filed a pretrial motion for disclosure of the identity of
17          the CI.  The prosecutor opposed the motion asserting that he did
            not know the CI's identity and it was no longer known to law
18          enforcement.  Additionally, the prosecutor argued that it appeared
            the CI did not have any personal information and that his
19          information was a matter of pure speculation as if "someone
            walked off the street and gave a bunch of theories about what had
20          happened . . . ."

21          When the court asked defense counsel why he had not contacted
            Garza and Delgado, counsel advised the court that he had made
22          fruitless attempts to do so.  Counsel asked for a hearing on law
            enforcement's reasonable attempts to preserve the CI's name and
23          address and that it would move for sanctions, depending on the
            outcome of that hearing.
24
            Nevertheless, the court held a hearing at which Captain Cox
25          testified.  Cox confirmed he had no current recollection of the CI's
            identity, that he unsuccessfully searched his files for his notes, and
26          he had no way to obtain the information.  He testified that his

                                        27

office investigated the possibility that Bateson's murder was the result of mistaken identity, that at the time the CI provided the information to him, he considered it important to the investigation, but he "absolutely" denied doing anything to "intentionally destroy information that would lead to the identify of this informant . . . ."

Characterizing the failure to preserve the CI's identity as "negligence," defense counsel requested that the court dismiss the charges against defendant as an appropriate sanction.  In the alternative, he requested that the court admit as evidence the CI's hearsay statements or instruct the jury that the defense was unable to contact the individual who might have had information.

Finding the information in the report pure speculation on the part of the CI, the court denied the motion and declined to impose any sanctions on the prosecution.

At trial, the defense renewed its request for evidentiary or instructional sanctions.  Counsel advised the court he was not arguing that Cox acted in bad faith.  The court impliedly denied the request.[9]

(Opinion at 23-25.)

The California Court of Appeal concluded that petitioner's claim in this regard should be denied because petitioner failed to show the prosecution acted in bad faith or that she was prejudiced by the loss of the evidence.  The appellate court reasoned as follows:

In California v. Trombetta (1984) 467 U.S. 479 [81 L.Ed.2d 413], law enforcement failed to preserve the defendant's breath samples used to determine blood-alcohol level in prosecutions for driving under the influence of alcohol.  The court found California's policy of not preserving breath samples does not violate a defendant's due process rights.  The duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  This standard was not met where the "chances were extremely low that the samples would have been exculpatory" and the defense could still attack the reliability of the breath tests. (Id. at pp. 488-489 [at p. 422-423], fn. omitted.)

[9] [footnote in text of opinion]  The matter was heard at the same time as the motion to exclude third-party culpability evidence.  Although the court granted the prosecution's motion to exclude, it did not expressly rule on the defense request for sanctions.

In Arizona v. Youngblood (1988) 488 U.S. 51 [102 L.Ed.2d 281] (Youngblood), the state court reversed the defendant's convictions for child molestation, sexual assault, and kidnapping, because state officials failed to preserve semen samples from the victim's body and clothing.   Defendant raised a mistaken identity defense. Reversing the state court's decision, the high court held "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (Id. at p. 58 [at p. 289], italics added.)

The court in Youngblood reasoned that "[t]he Due Process Clause of the Fourteenth Amendment, as interpreted in Brady[10] makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence.  But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in Trombetta, supra, [467 U.S. at page] 486, that '[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.'  Part of it stems from our unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause, [citation], as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant."  (488 U .S. at pp. 57-58 [at p. 289].)

Thus, a due process violation occurs when law enforcement officials fail to preserve evidence that is exculpatory, the exculpatory value was apparent before the evidence was destroyed, and was of such a nature that the defendant would be unable to obtain comparable evidence by other means. (Trombetta, supra, 467 U.S. at p. 489 [81 L.Ed.2d at p. 422].)  However, when the evidence in question is only potentially useful, the defendant must show bad faith on the part of the police.  (Youngblood, supra, 488 U.S. at p. 58 [102 L.Ed.2d at p. 289]; People v. Catlin (2001) 26 Cal.4th 81, 160.)

[10] [footnote in text of opinion] Brady v. Maryland (1963) 373 U.S. 83 [10 L.Ed.2d 215].

29

1
2
3
4
5

     The trial court's failure to impose sanctions was proper.  The
     information provided by the CI was not exculpatory in nature.  As
     defense counsel conceded at the hearing, it was nothing more than
     pure speculative hearsay based on rumor and innuendo.  The most
     that can be said for the CI's identity is that it might have led to
     potentially exculpatory evidence.  Defendant was required
     therefore to show that Captain Cox acted in bad faith by failing to
     preserve the CI's identity.   However defendant characterized Cox's
     treatment of the information as "negligent" and impliedly conceded
     at trial there was no bad faith.

6
7
8
9
10

     Nevertheless, citing a footnote in <u>Youngblood</u>, <u>supra</u>, 488 U.S. at
     page 56 [102 L.Ed.2d at p. 288], defendant now claims for the first
     time on appeal that Captain Cox acted in bad faith.  She bases this
     claim on the mere fact he testified that he knew of the exculpatory
     value of the evidence at the time it was lost or destroyed.  In view
     of defendant's concession that Cox did not act in bad faith, she has
     waived her right to make a contrary claim at this late date.  (<u>People
     v. Michaels</u> (2002) 28 Cal.4th 486, 511.)[11]

11
12
13
14
15
16

     Third, as the trial court found at the initial hearing, the defense had
     all the evidence the CI had and therefore it was not clear what more
     the CI could disclose even if he or she could be located.   The
     investigative report of the CI's statement identified several possible
     suspects by name including the names of the men associated with
     the Ford Fiesta.  The defense therefore had sufficient information
     to investigate its third-party culpability defense.  The fact those
     leads were fruitless only underscores the conjectural nature of the
     information and does not alter our conclusion that the defense was
     able to obtain comparable information by other means.

17
18

     Accordingly, because the information was not material and bad
     faith was not shown, the trial court properly denied defendant's
     request for sanctions.

19   (<u>Id.</u> at 26-30.)

20        Petitioner argues that by failing to impose sanctions against the prosecutor in the

21   form of allowing the introduction of the informant's statements, or advising the jury that the

22   prosecution failed to preserve exculpatory information relevant to third party culpability, the trial

23

24
25
26

     [11] [Cal App. footnote] While knowledge of the exculpatory value of the evidence may be
     a factor in finding bad faith (<u>Youngblood</u>, <u>supra</u>, 488 U.S. at p. 56 [102 L.Ed.2d at p. 288] ),
     <u>Youngblood</u> does not hold that it is the only factor.  After hearing testimony on the issue, the trial
     court found the loss of the CI's identity was not the result of bad faith.  We will not disturb that
     finding on this record.

1   court "effectively prevented petitioner from developing the necessary additional evidence to

2   place third party culpability before the jury."  (Pet. at 25.)

3           Due process requires that the prosecution disclose exculpatory evidence within its

4   possession.  Brady v. Maryland, 373 U.S. 83, 87 (1963).  However, a failure to preserve evidence

5   violates a defendant's right to due process only if the unavailable evidence possessed

6   "exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature

7   that the defendant would be unable to obtain comparable evidence by other reasonably available

8   means."  California v. Trombetta, 467 U.S. 479, 489 (1984); Cooper v. Calderon, 255 F.3d 1104,

9   1113 (9th Cir. 2001).  A defendant must also demonstrate that the police acted in bad faith in

10  failing to preserve potentially useful evidence.  Arizona v. Youngblood, 488 U.S. 51, 58 (1988);

11  Cooper, 255 F.3d at 1113; see also Guam v. Muna, 999 F.2d 397, 400 (9th Cir. 1993).   The

12  presence or absence of bad faith turns on the government's knowledge of the apparent

13  exculpatory value of the evidence at the time it was lost or destroyed.  Youngblood, 488 U.S. at

14  56-57 n.*; see also United States v. Cooper, 983 F.2d 928, 931 (9th Cir. 1993).

15          After a review of the record, this court concludes that the actions of the police in

16  failing to preserve the identity of the confidential informant did not violate petitioner's right to

17  due process.  Detective Cox testified that he interviewed the confidential informant years prior to

18  petitioner's trial in connection with his investigation into the Bateson murder.  (Respondents'

19  Lodged Doc. No. 9 at 12-14.)  He had a practice of recording the name and address of

20  confidential informants in a notebook and he believed he had done that in this case.  (Id. at 14.)

21  Cox testified that he was unable to locate his notes with the informant's identifying information

22  but he did not know when the notes were lost or why he was unable to locate them.  (Id. at 14-15,

23  18.)  He states, "I could have purged [the notebook] a few years back.  I don't know."  (Id. at 15.)

24  Cox also testified that, at the time he obtained the information from the informant, he considered

25  it "important, in terms of [his] investigation."  (Id. at 20.)  When asked whether he had "done

26  anything to intentionally destroy information that would lead to the identity of the informant," he

31

1   responded, "Absolutely not." (Id. at 21.) Cox also stated that he was not the primary

2   investigator on the case. (Id.) As explained by the state appellate court, petitioner's trial counsel

3   "characterized Cox's treatment of the information as 'negligent' and impliedly conceded at trial

4   there was no bad faith." (Opinion at 28-29; see also Respondents' Lodged Doc. No. 9 at 169-

5   70.)

6          Under the circumstances described above, even assuming arguendo that

7   production of the informant's identifying information may have been potentially useful to the

8   defense, petitioner cannot demonstrate that the failure to preserve this evidence was an act of bad

9   faith on the part of the prosecution. Although Detective Cox testified that he considered the

10  information given by the confidential informant to be important to his investigation at the time,

11  he did not testify, nor does it appear, that the informant's speculation as to the identity of the

12  killer(s) was sufficiently exculpatory. Further, as noted by the state court, "the defense had all

13  the evidence the CI had" and therefore could have followed up on this information itself. At

14  most, the record demonstrates that evidence that might have led to exculpatory information was

15  inadvertently lost. This is insufficient to demonstrate a due process violation.

16         Petitioner has also failed to demonstrate prejudice with respect to this claim.

17  Habeas relief is usually warranted only if the alleged constitutional errors had a "substantial and

18  injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S.

19  619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. at 776 (1946)). See also Fry v.

20  Pliler, ___ U.S. ___, 127 S.Ct. 2321, 2325 (2007) ("[t]he opinion in Brecht clearly assumed that

21  the Kotteakos standard would apply in virtually all § 2254 cases"). Petitioner acknowledges that

22  "the confidential informant was speculating" about possible explanations for Bateson's death.

23  (P&A at 25.) As explained by the California Court of Appeal, the informant suggested that three

24  people might have killed Bateson by mistake, believing he was Delgado. The informant offered

25  a number of different motives, depending on the suspect involved. Even if the jury heard all of

26  this evidence, there is no significant possibility the result of the proceedings would have been

1   different.  The information given by the confidential informant was conclusory, and obviously

2   based on guesswork.  Under these circumstances, the trial court's error, if any, in failing to

3   impose sanctions on the prosecution did not have a "substantial and injurious effect or influence

4   in determining the jury's verdict."

5          For all of these reasons, petitioner is not entitled to relief on this claim.

6          D.   <u>Failure to Admonish the Jury Following Prosecutorial Misconduct</u>

7          Petitioner claims that the trial court violated her right to a fair trial when it denied

8   her request for an admonition to the jury following prosecutorial misconduct in closing

9   argument.  The California Court of Appeal fairly described the background to this claim as

10  follows:

11           During his opening argument to the jury, the prosecutor spoke
             about defendant's 2001 statement to detectives in which she
12           confessed to shooting her husband.  While pointing out the
             circumstances of the interview, the prosecutor stated "[a]lthough it
13           was a confrontative interview, it clearly was not a coercive
             interview.  And you never would have heard that interview if it was
14           a coercive interview."

15           Shortly afterwards, the court recessed and defense counsel objected
             to the prosecutor's remark on the grounds it could leave the jury
16           with the erroneous impression the court had previously determined
             the confession was not coerced.  Counsel suggested that the court
17           admonish the jury with a curative instruction, which would have
             informed the jury the court had not concluded there was no
18           coercion and that it was for the jury to decide whether there was
             coercion and the weight to give it.
19
             The court agreed that someone could draw an inference from the
20           prosecutor's remark that the confession had passed judicial muster
             but declined to admonish the jury, concluding that it would only
21           aggravate the situation.  The court suggested that the parties clarify
             the matter during their remaining arguments.
22
             The parties then argued their respective positions as to whether the
23           confession was coerced and whether the jury should find
             defendant's confession was true.  Neither party however addressed
24           the issue whether the court had made a prior finding on the
             question of coercion or that it was the jury's role to make that
25           determination.

26  (Opinion at 20.)

1        The state appellate court concluded that any error in declining to give a jury

2  admonition was harmless, reasoning as follows:

3            Although the prosecutor has broad discretion to discuss the legal
           and factual merits of a case, it is improper to mislead the jury by
4            misstating the law.  (People v. Bell (1989) 49 Cal.3d 502, 538.)
           Because an involuntary confession is inadmissible, when the
5            voluntariness of a confession is in dispute, it is for the trial court to
           make that legal determination in the first instance outside the
6            presence of the jury.  (Jackson v. Denno (1964) 378 U.S. 368, 386
           [12 L.Ed.2d 908, 921].)   Evidence Code section 405 sets forth the
7            procedure for making that determination.  (People v. Carroll (1970)
           4 Cal.App.3d 52, 59-60.)
8
           However, while the jury cannot redetermine the admissibility of a
9            confession (See Evid.Code, § 405, subd. (b)(2)), the defendant has
           the right to produce evidence of coercion at trial bearing upon the
10           truth or falsity of her confession and the weight to be given it.
           (Jackson v. Denno, supra, 378 U.S. at p. 386, fn. 13 [12 L.Ed.2d at
11           p. 92]; People v. Memro (1985) 38 Cal.3d 658, 684, fn. 28; People
           v. Carroll, supra, 4 Cal.App.3d at p. 60.)
12
           As the trial court found, the prosecutor's statement may have
13           misled the jury about its role in determining the issue of coercion
           by implying the issue had already been determined by the court.
14           Nevertheless, because the trial court properly instructed the jury on
           its role during the instructional phase of the trial, neither the
15           prosecutor's remark nor the court's failure to admonish the jury at
           the time the remark was made resulted in a miscarriage of justice.
16           (People v. Watson (1956) 46 Cal.2d 818, 835.)

17           Defendant contends the prosecutor's remark was prejudicial
           because it was made during closing argument and the primary
18           factual issue in the case was the reliability and credibility of her
           confession.  While we do not disagree with defendant's claim the
19           confession was the centerpiece of the prosecution's case, we
           disagree with her conclusion the prosecutor's remark was
20           prejudicial.

21           The remark was a single isolated comment that was ambiguous and
           may have been misleading to some jurors at the time it was made.
22           However, any confusion was dispelled by the court's instructions to
           the jury.  As part of its instructional charge, the trial court told the
23           jury it was to determine what facts were proved from the evidence
           at trial and not from any other source, that statements made by the
24           attorneys during the trial were not evidence, and that the jury had
           to accept and follow the law as the court stated it, even if its
25           statement conflicted with the attorneys' statements.  The court also
           defined the terms "confession" and "admission" and then
26           immediately informed the jury, "You are the exclusive judges as to

34

1   whether the defendant made a confession or an admission, and if
2   so, whether that statement is true in whole or in part." We must
    assume the jury understood and faithfully followed the court's
3   instructions. (People v. Chavez (2000) 84 Cal.App.4th 25, 30-31.)

4   These instructions adequately clarified the jury's role in
    determining the issue of coercion.   Because defendant claimed the
5   detectives coerced her into falsely confessing and both parties fully
    argued that question, the instructions given were adequate to
6   inform the jury of its fact-finding role. The trial court was under
    no duty to give an admonition at the time the challenged remark
7   was made when the jury had been properly instructed on its
    fact-finding role during the instructional phase of the trial.
8   Accordingly, we find defendant was not prejudiced by the court's
    failure to admonish the jury as requested.

9   (Id. at 21-23.)

10          Petitioner's claim, in essence, is that the trial court violated her right to due

11  process and a fair trial when it failed to correct the possible false impression given by the

12  prosecutor during his closing argument.  As explained above, the California Court of Appeal

13  concluded that any error in this regard was harmless.  In order to grant habeas relief where a state

14  court has determined that a constitutional error was harmless, a reviewing court must determine:

15  (1) that the state court's decision was "contrary to" or an "unreasonable application" of federal

16  law with respect to harmless error, and (2) that the petitioner suffered prejudice under Brecht as a

17  result of the constitutional error.  Inthavong v. LaMarque, 420 F.3d 1055, 1059 (9th Cir. 2005).

18  See also Mitchell v. Esparza, 540 U.S. 12, 17-18 (2003) (when a state court determines that a

19  constitutional error is harmless, a federal court may not award habeas relief under § 2254 unless

20  that harmlessness determination itself was unreasonable).  Both of these tests must be satisfied

21  before relief can be granted.  Inthavong, 420 F.3d at 1061.

22          Assuming arguendo that the state trial court erred in failing to issue a jury

23  admonition following the prosecutor's closing argument, petitioner has failed to demonstrate that

24  the error sufficiently prejudiced her.  For the reasons expressed by the state appellate court, any

25  possible confusion inherent in the prosecutor's argument would have been cleared up by the jury

26  instructions as a whole, including the instruction that the jurors were the "exclusive judges" as to

35

whether petitioner made a truthful confession.  Just as importantly to the undersigned is the fact

that the jury would have understood the continuing arguments on confession coercion as a clear

indication that the issue was one for them to find.  What would have been the point of arguing

the issue, a juror would reason, if the matter had already been conclusively determined.  The

undersigned is also persuaded, as set out in the next section, that much indicia existed to suggest

that the confession was not coerced.  Petitioner was in a familiar setting and no reasonable person

would have believed that she was "in custody," the tone of the interrogation was not overbearing,

she was told she could talk to "someone else" if she so desired.  It is difficult to say that the

Court of Appeal was unreasonable when it found the potentially misleading comment harmless

despite the fact that it did tread on petitioner's primary defense to the confession.[12]  There is no

reasonable possibility that the trial court's failure to issue an admonition had a substantial and

injurious effect on the verdict in this case.  The state court's decision to the same effect is not

contrary to or an unreasonable application of federal law with respect to harmless error and

should not be set aside.

  E. _Involuntary Confession_

    Petitioner claims that her right to due process was violated by the admission into

evidence of her involuntary confession.  (Pet. at 28-29.)  The California Court of Appeal fairly

described the background to this claim as follows:

> In defendant's motion to exclude her confession, she argued that it
> was involuntary because the detectives conducted it with threats
> and implied promises of leniency and psychological coercion
> concerning her children.  The trial court read the transcript, listened
> to portions of the tape identified by counsel, and heard testimony
> from the two detectives who conducted the interview, as well as
> defendant.  The following testimony was given:
>
> Detective Grashoff testified that he suspected defendant of killing

[12]Although the point has not been raised by the parties, the prosecutor's comment could
be interpreted as vouching, i.e., that neither her nor his office would ever insert a coerced
confession into the case.  For the same reasons as stated above, the court would find such
vouching harmless.

Bateson and went to her house to get a confession.  Defendant was expecting Detective Grashoff when he and Detective Blankenship arrived at her home.  The detectives were wearing civilian clothing and were both carrying weapons.  The interview was conducted around defendant's kitchen table.  The detectives falsely told defendant a prosecutor had been assigned to the case and that they were close to solving it, and showed her a document of a "Secret Witness" tip, which they had created themselves.  They also showed her the cover sheet of an FBI "profile" on the case.

Defendant testified that she was 32 years old at the time of the interview, she was a high school graduate, and had attended half of a semester at Shasta College.  At the time she made her statement, her children were everything to her.  All she ever wanted was to be married with a family.  She took care of her three children and Jim, a developmentally disabled man with the mental capacity of a four-year old, who was present in the house during the interview.  The detectives spoke with her about matters unrelated to their investigation for about five to 10 minutes before turning on the tape recorder.  They then questioned her about her recollection of the day before and the day of the killing.  She did not feel she was under suspicion at that time.

Defendant tried to cooperate but she felt the detectives were not hearing her.  She became stressed during the interview because Jim kept interrupting and it was becoming apparent that the detectives did not believe what she was telling them.  When they became accusatory, she became nervous, scared, and intimidated because she did not know what they could do.  She knew she had rights but did not know what they were.  When the detectives began mentioning her children and imploring her to tell the truth so they could tell the district attorney she had cooperated, she became concerned the detectives could take her children away from her.  She thought if she told them what they wanted to hear by falsely confessing, she would be allowed to remain with her children and the detectives would leave her and her children alone.

At the conclusion of the hearing and after listening to the interview, the court found the interview was calm throughout and there was nothing overbearing, threatening, or intimidating about the officers' conduct.  The court concluded the prosecution had proven that defendant's confession was voluntary beyond a reasonable doubt and that under the totality of the circumstances, the confession was not coerced, but was an exercise of free will.  It therefore denied the motion to exclude the confession.

(Opinion at 30-32.)

Petitioner claims that the following circumstances compel a conclusion that her confession was involuntary: (1) Officer Grashoff went to petitioner's residence to secure a

1  confession; (2) Grashoff spent an hour "softening petitioner up" and then "went on the

2  offensive," accusing petitioner of inconsistency; (3) Grashoff referred to an FBI profile which

3  allegedly indicated that petitioner was guilty, and repeatedly told petitioner the officers knew she

4  was guilty; (4) Grashoff inferred petitioner would get more lenient treatment and would be able

5  to keep her children if she confessed; (5) Grashoff implied that petitioner would lose her children

6  if she did not confess; (6) Grashoff discouraged petitioner from talking to anyone before she

7  confessed and told her that her repeated requests to speak to someone demonstrated her guilt; and

8  (7) the interrogating detectives repeatedly implied that petitioner would get beneficial treatment

9  if she "told them what they wanted to hear." (Pet. at 28.)  Petitioner contends that she "adopted

10  the officer's suggestion that the reason she killed her husband was that he was controlling." (Id.)

11  She notes that she could not provide information regarding what she had done with the weapon,

12  which indicates that her confession was false. (Id.)

13          The California Court of Appeal concluded that petitioner's confession was

14  voluntary, reasoning as follows:

15          When the defendant challenges her confession as involuntary, it is
           inadmissible at trial unless the prosecution establishes by a
16          preponderance of the evidence that it was voluntary. (People v.
           Williams (1997) 16 Cal.4th 635, 659-660.) "A confession or
17          admission is involuntary, and thus subject to exclusion at trial, only
           if it is the product of coercive police activity." (Id. at p. 659.)  The
18          appellate court reviews the trial court's determination on the issue
           of voluntariness de novo, while reviewing the trial court's historical
19          findings of fact surrounding the confession under the deferential
           substantial evidence standard. (Id. at pp. 659-660.)
20
           "In deciding the question of voluntariness, the United States
21          Supreme Court has directed courts to consider 'the totality of
           circumstances.' [Citations.]  Relevant are 'the crucial element of
22          police coercion [citation]; the length of the interrogation [citation];
           its location [citation]; its continuity' as well as 'the defendant's
23          maturity [citation]; education [citation]; physical condition
           [citation]; and mental health.'" (People v. Williams, supra, 16
24          Cal.4th at p. 660, quoting Withrow v. Williams (1993) 507 U.S.
           680, 693-694 [123 L.Ed.2d 407, 420].)
25
           A confession is voluntary if the suspect's decision to speak is
26          entirely "self-motivated" because she freely and voluntarily

38

chooses to speak without any form of compulsion or promise of reward. (<u>People v. Thompson</u> (1980) 27 Cal.3d 303, 327-328.) No single factor is dispositive in determining the question of voluntariness. (<u>People v. Williams</u>, <u>supra</u>, 16 Cal.4th at p. 660.)

As defendant acknowledges, lies told by the police to a suspect under questioning do not render the confession involuntary per se. The court must look to see whether the deception is reasonably likely to procure an untrue confession. (<u>People v. Farnam</u> (2002) 28 Cal.4th 107, 182.) Similarly, police trickery, by itself, does not render a confession involuntary (<u>People v. Thompson</u> (1990) 50 Cal.3d 134, 167), because subterfuge is not necessarily coercive. (<u>People v. Felix</u> (1977) 72 Cal.App.3d 879, 885-886.) Thus, if the defendant is led to believe she might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, the prosecution, or the court, in consideration of making the statement, even if truthful, such motivation is deemed to render the statement involuntary. (<u>People v. Holloway</u> (2004) 33 Cal.4th 96, 115.) However, mere advice or exhortation that it would be better to tell the truth, when unaccompanied by either a threat or a promise, does not render a subsequent confession involuntary when the benefit pointed out is merely that which flows naturally from a truthful statement. (<u>Ibid.</u>)

Here the relevant considerations support the trial court's finding that the confession was voluntary. At the time of the interview, defendant was 32 years old, had graduated from high school and had attended college for a short time. She consented to the interview, which took place in her home around the kitchen table. The detectives were in plain clothes and defendant was not under arrest. She was free to move about her home and to speak to someone. Defendant had been living for nine years with the horrible secret that she killed her husband. During the interview, detective Grashoff reviewed the events leading up to and following the killing, pointed out the inconsistencies in defendant's story, informed her that her denials were no longer credible, and that the matter would not go away if she continued to deny that she killed her husband. He did not badger her. The detectives' promises that they would not arrest her that day, they would immediately leave upon her request, and that she could halt the interview at any time, further served to eliminate a coercive atmosphere. Any implied benefits arising from their statement that they would inform the prosecutor of her cooperation if she gave a truthful statement, was merely that which would flow naturally from such a statement.

The interview lasted approximately two hours. After telling the detectives that she shot Bateson, and explaining why she did it, defendant admitted that she felt a little better having told the truth and that it was off her heart. She explained that when she shot Bateson, she was not thinking right, that she was 22 years old when she shot him, she had grown a lot in the last nine years and would

39

never do something like that now.  When the detective asked her how often she thought about it during the past nine years, she stated, "[a]ll the time."  When he asked her if she was being honest with him she replied, "Yes, I am being honest.  If I wasn't gonna be honest with you I could have sat here and said 'no.'"  At the end of the interview, the detective asked defendant how many times she shot Bateson.  She said she "snapped" and did not know what she did.  When the detective repeated, "How many times?" she stated "I don't remember.  I'm not gonna say a number if I don't know.  So."  These are not the responses of a person who has been coerced into falsely confessing.  To the contrary, they demonstrate that she was acting under her own free will and in her own interests.

Nevertheless, defendant argues that when the detective told her she should not let "this thing bite you in the butt on down the road with your kids" he created an inference that defendant would get more lenient treatment if she confessed and would not lose her kids.  We disagree.  The detective stated, "You don't want this thing, . . . down the road, it's gonna come up sooner or later.  And they're gonna take you away from your kids.  I'm giving you the opportunity now to tell the truth."  We fail to see any promise of leniency in this statement.  The detective was merely suggesting that if defendant did not presently own up to her crime, it would eventually catch up to her and her children and she would lose them sooner or later.

The detective's statement, "if you're guilty, I mean that's the best thing to do is get an attorney," does not imply that defendant is guilty.  When defendant indicated that she wanted to talk to someone first, the detective stated "You don't want to tell the truth then that's fine.  You want to talk to somebody first that's fine.  Maybe we can set up an appointment later to talk about it.  But, I'm just offering you the opportunity now for you to tell the truth.  I mean you're the one that has to deal with it.  I really feel sorry for your kids."  Defendant then stated that she did not "remember, things."  After asking her what she did not remember, he said, "Okay, I'll ask you. Straight up.  Did you shoot Charlie?" whereupon defendant said, "Yes."  Again, there is nothing in this line of inquiry that threatened defendant with the loss of her children if she did not immediately confess.  The detective was merely suggesting that it is difficult to live with a lie and that he feels sorry for the children because they are also affected.

We therefore conclude under the totality of circumstances, the confession was voluntary.  Accordingly, the trial court properly denied defendant's request to suppress the confession.

(Opinion at 32-37.)

\\\\\

1          As set forth above, the California Court of Appeal referred back to and

2   incorporated the reasoning of the trial court in its own decision on petitioner's claim.

3   Accordingly, this court will apply the AEDPA standards to the conclusion of the trial court as

4   well as the appellate court when analyzing petitioner's claim that her confession was involuntary.

5   See Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007).  The trial court explained its

6   ruling denying petitioner's motion to suppress her confession as follows:

7                    The motion is denied.  I think the test is beyond a reasonable
                     doubt, although in this case I don't even entertain a reasonable
8                    doubt.  The people have proven to my satisfaction beyond a
                     reasonable doubt that this statement is voluntary.  It's not the
9                    product of coercion.  I think I have already recited what I have
                     considered.  Another thing that may not be fully on the record
10                   unless one actually listens to the tape is the tones of voice or the
                     tones of voice on the tape.  It was a calm conversation throughout.
11                   The officers were using calm tones.

12                   I have heard what Ms. Lunbery said about body language, but in
                     terms of the tones of voice, volume, things of that nature that one
13                   can discern from an audio tape, there was nothing overbearing,
                     coercive, threatening, or intimidating about the officer's conduct.
14
                     In terms of this, quote, believing she knew what the officers
15                   wanted her to say or what the truth is, close quote, in virtually
                     every case where somebody has once been interviewed and denied
16                   culpability and that person is again interviewed and is told that that
                     person is a suspect and the officers want the truth, that same
17                   argument could be made.  Well, it's implicit that they didn't like
                     what they heard before, but the officers made it clear why they
18                   didn't believe the prior comments, and that's what that whole
                     analogy with the Popsicles was about; that there's circumstantial
19                   evidence and other evidence that points to her, and so that was
                     pointed out to the defendant.  There's nothing improper about that.
20
                     So one of the tests that I am supposed to look at is was there an
21                   exercise of freewill, and the transcript and the tape are replete with
                     evidence that Ms. Lunbery knew what was going on; that she was
22                   exercising her freewill.  She twice commented upon the possibility
                     that she would talk to someone else.  In response she was told that
23                   she could.  No threatening consequence was presented if she did
                     that, and just seconds before she ultimately admitted responsibility
24                   for shooting her husband, she is told by one of the detectives that if
                     she wants to talk to someone else, she can do that and that they
25                   could maybe reschedule the interview for a later time.  That is not
                     suggestive of overbearance.  That is not suggestive of coercion.
26                   That's not suggestive of intimidation or threats.

41

When I look at the totality of the circumstances, I am mindful that she was not advised of her Miranda. I think we all recognize that she was not in custody. That was made abundantly clear to her on the tape, but this is one of the factors I should consider, and I do. It's clear that the defendant was aware she could talk to someone else and the officers confirmed that and did not suggest otherwise and did not suggest that if she chose to do that she would be arrested or that she would get any other consequence other than those she in my view unreasonably – if she took these inferences, she took them unreasonably, not due to any misconduct, that there was going to be some implied promise or detriment if she didn't go the way she thought the officers wanted her to. And there are numerous other places where Ms. Lunbery's questions and statements indicate exercise of freewill and indicates she was not intimidated.

As a matter of fact, she very close to the time she ultimately confessed was obviously trying to cause the detectives to tell her what they knew. She wanted to know what the Popsicle on her face was. She wanted to know what she was up against before she made a decision. That's just further evidence that she was in a decision-making process, and it was one of her own freewill.

So my view is the statement is voluntary. It's an exercise of her own freewill, not the product of coercion or overbearing tactics, not the product of promised benefits, threats, or promised avoided consequences or leniency.

So the motion is denied, and the tape will be admissible.

(Respondents' Lodged Doc. No. 9 at 134-36.)

The Constitution demands that confessions be made voluntarily. See Lego v. Twomey, 404 U.S. 477, 483-85 (1972). Involuntary confessions may not be used to convict criminal defendants because they are inherently untrustworthy and because society shares "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." Spano v. New York, 360 U.S. 315, 320-21 (1959). A confession is voluntary only if it is "'the product of a rational intellect and a free will.'" Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir. 1989) (quoting Townsend v. Sain, 372 U.S. 293, 307 (1963)). See also Blackburn v. Alabama, 361 U.S. 199, 208 (1960). "The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or

1 however infused, propels or helps to propel the confession." Collazo v. Estelle, 940 F.2d 411,

2 416 (9th Cir. 1991) (en banc) (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)).

3         "There is no 'talismanic definition of voluntariness' that is 'mechanically

4 applicable.'" Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) (quoting Schneckloth v.

5 Bustamonte, 412 U.S. 218, 224 (1973)).  Rather, voluntariness is to be determined in light of the

6 totality of the circumstances.  See Miller v. Fenton, 474 U.S. 104, 112 (1985); Haynes v.

7 Washington, 373 U.S. 503, 513 (1963); Beatty v. Stewart, 303 F.3d 975, 992 (9th Cir. 2002).

8 This includes consideration of both the characteristics of the petitioner and the details of the

9 interrogation.  Schneckloth, 412 U.S. at 226.  Relevant circumstances that should be considered

10 include the following factors: (1) the youth of the accused; (2) his/her intelligence; (3) the lack of

11 any advice to the accused of his/her constitutional rights; (4) the length of the detention; (5) the

12 prolonged nature of the questioning; and (6) the use of any punishment such as the deprivation of

13 food or sleep.  Id. at 226; United States v. Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003).

14         Officials cannot extract a  confession "by any sort of threats or violence, nor . . .

15 by any direct or implied promises, however slight, nor by the exertion of any improper

16 influence." Hutto v. Ross, 429 U.S. 38, 30 (1976) (quoting Bram v. United States, 168 U.S. 532,

17 542-43 (1897)).[13]  Neither physical intimidation nor psychological pressure is permissible.

18 Haswood, 350 F.3d at 1027 ("A confession is involuntary if coerced either by physical

19 intimidation or psychological pressure."); United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir.

20 1981) ("subtle psychological coercion suffices . . . at times more effectively 'to overbear a

21 rational intellect and a free will'").

22         False promises or threats may also render a confession invalid.  See, e.g., Lynumn

23 v. Illinois, 372 U.S. 528, 534 (1963) (confession found to be coerced by officers' false statements

24

25     [13] This broadly-stated rule has not been applied to invalidate, per se, all statements made
by a suspect in response to a promise made by law enforcement personnel.  Rather, the promise
must be sufficiently compelling to overbear the suspect's will in light of all attendant

26 circumstances.  See Hutto, 429 U.S. at 30.

that state financial aid for defendant's infant children would be cut off, and her children taken

from her, if she did not cooperate); Rogers v. Richmond, 365 U.S. 534, 541-45 (1961)

(defendant's confession was coerced when it was obtained in response to a police threat to take

defendant's wife into custody); Spano, 360 U.S. at 323 (confession found to be coerced where

police instructed a friend of the accused to falsely state that petitioner's telephone call had gotten

him into trouble, that his job was in jeopardy and that loss of his job would be disastrous to his

three children, his wife and his unborn child); Miranda v. Arizona, 384 U.S. 436, 476 (1966)

("any evidence that the accused was threatened, tricked, or cajoled into a waiver (of Fifth

Amendment right to remain silent) will, of course, show that the defendant did not voluntarily

waive his privilege").  But cf. Pollard v. Galaza, 290 F.3d 1030, 1034 (9th Cir. 2002)

("misrepresentations made by law enforcement in obtaining a statement, while reprehensible,

does not necessarily constitute coercive conduct").

Where an involuntary confession is improperly admitted at trial, a reviewing court

must apply a harmless error analysis, assessing the error "in the context of other evidence

presented in order to determine whether its admission was harmless beyond a reasonable doubt."

Arizona v. Fulminante, 499 U.S. 279, 308 (1991).  In the context of habeas review, the standard

is whether the error had substantial and injurious effect or influence in determining the jury's

verdict.  See Brecht, 507 U.S. at 637; Beatty, 303 F.3d at 994.  The analysis must be conducted

with an awareness that "a confession is like no other evidence," and that "a full confession may

have a 'profound impact' on the jury."  Fulminante, 499 U.S. at 296.  See also Taylor v. Maddox,

366 F.3d 992, 1017 (9th Cir. 2004).

This court has reviewed the written transcript of petitioner's confession.  See CT

458A-541; (also CT 114-196).  After numerous pages of general conversation, Detective

Grashoff informed petitioner that things were "pointing in [her] direction."  (Respondents'

Lodged Doc. No. 10 (CT) at 521.)  He informed petitioner that he suspected her of shooting her

husband and stated that "if this is the case that Charlie was being abusive to ya and something

44

where you just snapped, and it happened, let me know now, so I can go to the DA and tell him, that, number one you're being honest with me." (Id. at 522.) Grashoff stated that "the best thing you can do right now for yourself, is so I can go back to the District Attorneys office and say, Mr. District Attorney, yes there is one assigned to the case already . . .  she was honest with me and told me the truth.  That's what you've got going for you right now." (Id. at 524.)  Grashoff told petitioner that the train was "leaving the station" and that she didn't "want to miss it." (Id.)  He also stated:

> You have to deal with it.  This has been going on a long time, and its gut wrenching at you, this has been nine years now, and I know you had to been thinking about it.  And if it's a case where, you know, if Charlie was abusing you, and I've talked to witnesses and they told me, well they thought Charlie was abusing you, that's at one time.  If that's the case, tell me.  Don't let this thing bite you in the butt down the road.  Now tell me the truth what happened.

(Id. at 524.)

After Detective Grashoff informed petitioner once again that they "know you did it," she stated, "I personally think that I know enough about the law that, that I mean I have um, rights to be able to talk to someone." (Id. at 525.)  Grashoff responded, "Sure.  You, you, you do." (Id.)  He further stated "if you're guilty, I mean that's the best thing to do is get an attorney" . . . "that is totally up to you . . . That is your decision," and "that is certainly your right, to talk to an attorney." (Id.)  Grashoff further informed petitioner that "you can tell me to leave at any time." (Id.)

Petitioner then asked Detective Grashoff what evidence they had against her. (Id.) Grashoff declined to describe the evidence. (Id.)  He told petitioner that he was giving her the opportunity to tell the truth, that the "train [was] leaving the station," that the ball was in her court, and that he was not going to arrest her at that time. (Id. at 526.)  After several other statements, Grashoff stated, "You don't want this thing keep, down the road, it's gonna come up sooner or later.  And they're gonna take you away from your kids.  I'm giving you the opportunity now to tell the truth." (Id. at 527.)  He told petitioner that he was offering her the

45

1   opportunity to tell the truth, that she was the one who had to "deal with it," and that he felt sorry

2   for her kids.  (Id. at 529.)  Petitioner stated that there were things she didn't remember.  (Id.)

3   Grashoff responded,  "Okay, I'll ask you.  Straight up.  Did you shoot Charlie?"  (Id.)  Petitioner

4   then stated, "yes," and continued with her confession.  (Id.)

5          After stating that she shot her husband, petitioner explained that he was

6   "controlling," that he had "grabbed" her several times, that she didn't like the way he talked to

7   her, and that "no one could say 'hi' to me without it causing an argument."  (Id. at 530, 535-36.)

8   Petitioner explained that she "didn't do it to hurt anyone," and that "even though I know . . . I did

9   it, . . . I just wasn't thinking right."  (Id. at 532.)  She couldn't remember what she did with the

10  gun, but she remembered "driving around a lot."  (Id.)  Petitioner also answered specific

11  questions about her commission of the crime.  (Id. at 533-35.)  She explained that she had

12  changed since the shooting had occurred, that she would never do something like that now, and

13  that she "obviously was not thinking straight."  (Id. at 537.)  Petitioner stated she thought about it

14  "all the time," that she "wished [she] could have done things different," and that she wished

15  every day that she could "take it back."  (Id. at 540-41.)

16          The California Court of Appeal concluded that the totality of the circumstances

17  demonstrated that petitioner's confession was voluntary.  This court agrees.  As noted by the

18  state appellate court, at the time of the interrogation petitioner was an educated 32 year old, she

19  had consented to the interview, the interview took place in her own home, and she was told

20  several times that she would not be arrested that day and that she could tell the detectives to

21  leave.  The trial court found, after listening to the audiotape, that the interview was "calm" and

22  that there was nothing "overbearing, coercive, threatening, or intimidating" about the officer's

23  conduct on the tape.  Although the audiotape of petitioner's interrogation has not been lodged

24  with this court, the trial court's factual findings in this regard are entitled to a presumption of

25  correctness under AEDPA and they have not been rebutted by petitioner.  Rupe v. Wood, 93 F.3d

26  1434, 1444 (9th Cir. 1996).  See also 28 U.S.C. §2254(d)(2).  The state appellate court also noted

1   that petitioner refused to answer questions regarding events she could not remember, stated that

2   she was being honest, described her current feelings about the crime she committed, and

3   admitted she thought about the shooting all the time.  This court agrees with the state court that

4   these "are not the responses of a person who has been coerced into falsely confessing." (Opinion

5   at 35.)

6          The California Court of Appeal concluded that Detective Grashoff's false

7   statements to petitioner, standing alone, did not render the circumstances coercive.  (Id. at 33.)

8   This conclusion is consistent with United States Supreme Court precedent, which has refused to

9   find that a defendant who confesses after being falsely told that his codefendant has turned State's

10  evidence has done so involuntarily, where the totality of the circumstances indicates the

11  confession was voluntarily made.  Frazier v. Cupp, 394 U.S. 731, 739 (1969).  The state appellate

12  court also concluded that Detective Grashoff did not make in implied promise of leniency when

13  he told petitioner he would advise the prosecutor of her truthfulness if she would admit her role

14  in the crime.  The court found that this was simply a result "which would flow naturally from

15  such a statement." (Opinion at 35.)  This court agrees with the California Court of Appeal that

16  these statements were not coercive.  It is true that a promise of leniency accompanied by threats

17  or other coercive practices constitutes improper influence and may make a subsequent

18  inculpatory statement involuntary.  See Tingle, 658 F.2d at 1336.  However, Detective Grashoff

19  did not promise anything to petitioner or even hint that petitioner would receive favorable

20  treatment in her criminal case if she confessed.

21         Nor were Detective Grashoff's statements accompanied by threats or other

22  coercive practices that would render a subsequent confession involuntary.  "[C]oercive police

23  activity is a necessary predicate to the finding that a confession is not 'voluntary' within the

24  meaning of the Due Process Clause...."  Colorado v. Connelly, 479 U.S. 157, 167 (1986).  See

25  also United States v. Harrison, 34 F.3d 886, 891 (9th Cir. 1994) ("[I]n most circumstances,

26  speculation that cooperation will benefit the defendant or even promises to recommend leniency

47

1   are not sufficiently compelling to overbear a defendant's will"); United States v. Leon Guerrero,

2   847 F.2d 1363, 1366 (9th Cir. 1988) (citations omitted) (an interrogating agent's promise to

3   inform the government prosecutor about a suspect's cooperation, even if accompanied by a

4   promise to recommend leniency or by speculation that cooperation would have a positive effect,

5   would not render a subsequent statement involuntary in the absence of threats or other coercive

6   practices).

7           Further, even if Detective Grashoff implied that petitioner would fare better if she

8   confessed to her role in the events, the California Court of Appeal did not clearly err in finding

9   that petitioner's refusal to fully cooperate with Detective Grashoff during the latter portion of the

10  interrogation demonstrates that her will was not overborne.  The fact that petitioner refused to

11  answer questions if she did not remember the events suggests that she felt comfortable exercising

12  her free will and that there was no causal link between the purported promise of leniency and her

13  later confession.  In short, the evidence indicates that Detective Grashoff did not make any

14  specific promises of leniency, let alone promises significant enough to overbear petitioner's will.

15          This court also agrees with the state appellate court that Detective Grashoff's

16  comments about petitioner's children did not rise to the level of a promise of lenient treatment if

17  she confessed or a threat to take away her children if she didn't confess.  Cf. Tingle, 658 F.2d at

18  1336 (interrogation deemed coercive where the interrogating agent informed defendant of the

19  maximum penalties for the crimes of which she was suspected, totaling 40 years imprisonment;

20  stated that defendant would not see her two-year-old child "for a while;" warned defendant that

21  she had "a lot at stake;" told defendant that it would be in her best interest to cooperate and that

22  her cooperation would be communicated to the prosecutor; and told defendant that if she failed to

23  cooperate he would inform the prosecutor that she was "stubborn or hard-headed").  The state

24  court's conclusion that Detective Grashoff was merely "suggesting that if defendant did not

25  presently own up to her crime, it would eventually catch up to her and her children and she

26  would lose them sooner or later" is not an unreasonable determination of the facts of this case.

1    See 28 U.S.C. § 2254(d)(2).[14]

2           This court notes that petitioner was not advised of her constitutional (Miranda)

3    rights during the interrogation at her home.  The trial court opined that petitioner was not in

4    custody, and therefore not entitled to Miranda warnings, because the totality of the circumstances

5    indicated petitioner was free to terminate the interview.  This conclusion is consistent with the

6    record before this court.  Cf. United States v. Craighead, ___ F.3d ___, 2008 WL 3863709 at *6

7    (9th Cir. (Ariz.)) (defendant was in custody during in-home interrogation for Miranda purposes

8    where circumstances made clear he was not free to terminate the interview or leave his house).

9    Accordingly, the lack of Miranda warnings in this case does not support a finding that

10   petitioner's confession was involuntary.

11          The California courts concluded that the totality of the circumstances indicated

12   petitioner's confession was voluntary and that Detective Grashoff's methods of interrogation,

13   including his remarks about petitioner's children and his promise to tell the prosecutor if she was

14   truthful, did not cause petitioner's will to be overborne.  This court agrees.  A review of the

15   relevant record reflects that the questioning in this case was not so heavy-handed that it would

16   have caused petitioner to lose "self-direction."  The decision of the California Court of Appeal

17   denying petitioner's claims in this regard is not contrary to or an unreasonable application of

18   federal authority, nor is it based on an unreasonable determination of the facts.  Accordingly,

19   petitioner is not entitled to habeas relief.

20   \\\\\

21   \\\\\

22   \\\\\

23   \\\\\

24

25   [14]  The statement about taking away the kids is the most problematic.  But it was not
     stated that they would be taken away, now.  Actually, the statement as said might have deterred a
     confession at that point – if the kids were inevitably going to be taken away later, if she did not
26   confess now, a person might just wait until later to confess, and avoid the hard realties now.

1    Accordingly, IT IS HEREBY ORDERED that petitioner's application for a writ of

2 habeas corpus is denied, and judgment is entered in favor of respondent.

3 Dated: 11/07/08

             /s/ Gregory G. Hollows

4               _____

             UNITED STATES MAGISTRATE JUDGE

5 ggh:8

 lunbery1279.hc

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26